UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>MARIANO SANTANA,<br><br>    Defendant. | Case No. 1:22-CR-10279-AK |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant Mariano Santana ("Mr. Santana") respectfully submits this memorandum in support of his sentencing recommendation of time served (419 days, or 13 months and 23 days) followed by two years of Supervised Release.

1. **Applicable Statute**

    18 U.S.C. § 3553(a) provides as follows:

    > The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this section. The court, in determining the particular sentence to be imposed, shall consider - (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for [the Sentencing Guidelines]; (5) any pertinent policy statements [by the Sentencing Commission]; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

1

2. **Advisory Sentencing Guidelines**

After *United States v. Booker*, 543 U.S. 220, 259 (2005), the sentencing guidelines are not mandatory, but advisory. The sentencing court must compute the sentencing guidelines, which are the "starting point and the initial benchmark," but which may not be presumed reasonable. *Gall v. United States*, 552 U.S. 38, 49-51 (2007). Then, the court considers the parties' arguments, after which it makes an "individualized assessment based on the facts presented," considering all the factors under 18 USC § 3553(a). *Id*. Ultimately, the Court must select a sentence within the statutory range that is "sufficient, but not greater than necessary" to satisfy the varied purposes of sentencing identified by Congress. 18 USC § 3553(a).

   a. **Offense Level Computation**

Mr. Santana agrees with the advisory sentencing guideline calculations set forth in the Presentence Investigation Report ("PSR"), *see* PSR, ¶¶21-30, 54, with the exception that the Court should further decrease the offense level by 2 levels since he was at most a "minor participant" in the criminal activity. *See* USSG §3B1.2

As to the Offense Level Computation, Mr. Santana's base offense level is 14 under USSG §§2S1.1(a)(2) and 2B1.1(b)(1)(D). *See* PSR ¶21. Since Mr. Santana was convicted under 16 U.S.C. §1956, there is an increase by 2 levels under USSG §2S1.1(b)(2)(B). *See* PSR ¶23. Mr. Santana's acceptance of responsibility results in a decrease of 3 levels. *See* PSR ¶¶29-30. Based on the above, the PSR provides Total Offense Level is 13. *See* PSR ¶31. For the reasons stated below, Mr. Santana request an additional 2-level reduction for his role as a "minor participant" in the offense, resulting in a Total Offense Level of 11.

   (1) **"Minor Participant" Reduction**

Mr. Santana was at most a "minor participant" in this offense, justifying at least a 2-level

2

reduction of his offense level. *See* USSG §3B1.2(b). USSG §3B1.2 "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity." *See* USSG §3B1.2, comment (n.3(A)).

"The determination whether to apply subsection (a) [4-level "minimal participant" adjustment] or subsection (b) [2-level "minor role" adjustment], or an intermediate adjustment, is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." *See* USSG §3B1.2, comment (n.3(C))." In making a "mitigating role" determination, "the court should consider the following non-exhaustive list of factors:

(i) the degree to which the defendant understood the scope and structure of the criminal activity;

(ii) the degree to which the defendant participated in planning or organizing the criminal activity;

(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v) the degree to which the defendant stood to benefit from the criminal activity."

*See id*.

"For example, a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline." *See id*. As to "minimal participants," "[s]ubsection (a) applies to a defendant . . . who plays a minimal role in the criminal activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." *See* USSG §3B1.2, comment (n.5). As to "minor participants," "[s]ubsection (b) applies to a defendant . . . who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." *See id*.

The First Circuit has held, "To qualify for this reduction, 'the defendant must satisfy a two-pronged test. First, he must demonstrate that he is less culpable than most of those involved in the offense of conviction. Second, he must establish that he is less culpable than most of those who have perpetrated similar crimes.'" *United States v. Gómez-Encarnación*, 885 F.3d 52, 56-7 (1st Cir. 2018), quoting *United States v. Mateo-Espejo*, 426 F.3d 508, 512 (1st Cir. 2005) (internal citations omitted).

### a. The Conduct Committed by Other Defendants

Mr. Santana is certainly among the least involved defendants in this case, and probably the least involved. *See* PSR ¶5. When the government filed the original Criminal Complaint on October 7, 2022, Mr. Santana was defendant number seven in a seven-defendant case. *See* D.E. 4. All the other defendants from that criminal complaint, Jin Hua Zhang ("Zhang"), Feng Chen ("Chen"), Licheng Huang ("Huang"), Roger Luo ("Luo"), Thong Nguyen ("Nguyen"), and

Augustin Villa ("Villa"), performed far more significant roles than Mr. Santana.

Zhang was the leader of an organization that laundered $25 million in various countries, including China, India, Cambodia, and Brazil. *See* D.E. 4-1 (filed 10/07/22), ¶4. Huang was instrumental to the operation, discussing with a cooperating witness ("CW-1") if he "knew anyone who could launder the proceeds of drug sales by United States currency into Chinese renminbi (RMB) and then having those funds deposited into Chinese bank accounts." *See id*. ¶6. Huang later agreed with CW-1 to convert the drug funds into cryptocurrency; he also had direct contact with Zhang. *See id.* ¶¶7, 9. Both Huang and Chen made bulk cash delivers in August 2021, with Chen working with leader Zhang and Huang to accomplish the money laundering. *See id.* ¶¶11-15. Luo assisted with bulk cash drop offs to CW-1 and another cooperating witness ("CW-2") "on four occasions." *See id.* ¶¶18-21. Those drop offs included a $71,050 drop-off on November 22, 2021, a $203,000 drop-off on November 30, 2021, another $71,050 drop-off on January 12, 2022, and a $101,500 drop-off on January 14, 2022. *See id*. Nguyen delivered $103,800 on March 16, 2022, and on April 11, 2022 was seized with $109,850 and a firearm. *See id*. ¶¶23-26. Villa delivered $75,860 on May 26, 2022. *See id*. ¶27.

The five defendants added by the indictment (D.E. 10) and superseding indictment (D.E. 114) were also more culpable than Mr. Santana. *See* D.E. 4-1 (filed 10/12/22). Rongjian Li ("Li") was a "Bank of America employee who opened several accounts that ZHANG Organization members used to launder illicit funds. Agents obtained Bank of America records showing that Li frequently ran queries checking on the status of these accounts." *See id.* ¶7. Li was also present when Zhang "discussed with the UCs the location and volume of future cash pick-ups and sources of illicit funds to be laundered," as well as investment fraud operations in Cambodia. *See id*. ¶¶9-10. Qinliang Chen ("Qinliang") was a "California-based drug courier"

5

who "delivered more than $120,000 in cash to an FBI CW" and was seized with $161,905 of funds to be laundered at a second meeting with agents. *See id*. ¶14.

Yanbing Chen ("Yanbing") was charged not only with money laundering conspiracy (count one), but also conspiracy to distribute and to possess with the intent to distribute controlled substances (count two). *See* D.E. 114. On August 12, 2022, Yanbing delivered over three kilograms to UC-2. *See* D.E. 4-1 (filed 10/12/22), ¶23-26. In September 2022, "Zhang and Yanbing facilitated the delivery of two more kilograms of cocaine in Boston." *See id*. ¶27. Xiong Lin ("Lin") also conspired to distribute and to possess with the intent to distribute controlled substances (count two), with more than 500 grams of cocaine attributable to him. *See* D.E. 114. Specifically, on May 22, 2022 while working for Zhang, Lin delivered to an undercover agent a shopping bag "containing approximately one kilogram of cocaine." *See* D.E. 4-1 (filed 10/12/22), ¶31.

Finally, Qing Hua Sun ("Sun") and Zhang "discussed expanding their money laundering business" in a "lengthy video-recorded meeting" involving undercover agents. *See* D.E. 1-1 (filed 04/14/23), ¶11. In Sun's company, Zhang explained "T5" money, in which "funds come from victims of fraud schemes" where victims are lured to "invest in" cryptocurrency scams. *See id*. ¶12. During the meeting, "Sun told the UCs that the volume of deposits into the receiving accounts was hard to control" and that "$10,000 or $20,000 would be wired to Sun's account per day." *See id*. ¶13. On April 4, 2020, Zhang and Sun also met with undercover agents regarding laundering funds derived from a Cambodia-Based Fraud Scheme. *See id*. ¶¶20-24.

### b. Mr. Santana Role as a "Minor Participant"

In contrast to the above, Mr. Santana's role in this case was limited to just two days, June 1 and June 7, 2022, in which he handled less money than any other defendant involved in

laundering. *See* PSR ¶¶12-16. On June 1st he dropped off $30,000, and on June 7th he dropped off $29,800. *See id*.

Though Mr. Santana understood that the drop-offs involved the proceeds of some unlawful activity, as 18 U.S.C. § 1956 requires, he was unaware of the "scope and structure" of the activities performed by Zhang and his organization. *See* USSG §3B1.2, comment (n.5). For example, whereas "[a]gents traced funds from the Zhang organization to Hong Kong and elsewhere in China, India, Cambodia, and Brazil," Mr. Santana's had no knowledge of such a wide scope of the operation; instead, his conduct was limited to a parking lot in Quincy over two dates. *See* PSR ¶11, 13-16. Moreover, "[t]here is no information indicate Zhang's employee and the defendant had a discussion regarding drugs."[1] *See* PSR ¶22. Most defendants in a money laundering scheme know where the money comes from and have a sense of the scope of the operation; Mr. Santana, however, was not like most defendants. As discussed below, Mr. Santana is a poor and disabled man with significant mental health and addiction issues who regrettably played a brief and limited role in this matter. At most, he was a minor participant in this offense, and he ought to receive at least a 2-level reduction from his offense level calculation. *See* USSG §3B1.2

b. **Criminal History Computation**

As to the Criminal History Computation, Mr. Santana agrees that his total criminal history score is 3, establishing a criminal history category of II. *See* PSR ¶¶50, 53-54.

c. **Guideline Sentencing Range**

If the Court finds that Mr. Santana was a "minor participant," Mr. Santana's total offense

---

[1] In the past, the government has contended that Mr. Santana "knew or believed that any of the laundered funds were proceeds of, or were intended to promote, an offense involving the importation or distribution of a controlled substance." *See* D.E. 159 ("Plea Agreement), ¶3(b). As the PSR accurately states, however, there is no information to support that conclusion; therefore, no sentencing enhancement applies. *See* PSR ¶¶22, 114.

level would be 11. With a criminal history category of II, the guideline imprisonment range would be 8-14 months.

If the Court finds that Mr. Santana was not a "minor participant," Mr. Santana's total offense level would be 13. With a criminal history category of II, the guideline imprisonment rage would be 15 to 21 months. *See* PSR ¶113.

The guideline range for a term of supervised release is 1 to 3 years. *See* PSR ¶116.

3. **Nature and Circumstances of the Offense**

As discussed above, Mr. Santana is among the least involved defendants in this twelve defendant case. *See* PSR ¶5. The FBI commenced its investigation into Zhang, based in Staten Island, New York, and his organization in 2021. *See* PSR ¶8. Mr. Santana's involvement, however, was limited to just two days, June 1 and June 7, 2022. *See* PSR ¶¶12-16. Further, "[i]n less than one year, Zhang and his organization laundered at least $25 million worth of drug proceeds and funds from other illegal businesses through the FBI undercover agents." *See* PSR ¶11. By contrast, Mr. Santana's involvement was limited to just $59,800. *See* PSR ¶¶12-16, 21. Crucially, there is no evidence he understood the wide international scope of the scheme, and "[t]here is no information indicate Zhang's employee and the defendant had a discussion regarding drugs." *See* PSR ¶22. Simply put, Mr. Santana was at most a minor participant in this case.

4. **Personal History and Characteristics of Mr. Santana**

Mr. Santana is a 55 year-old man with serious mental health and addiction issues. In 2013, he was diagnosed with major depressive disorder and anxiety, as verified by probation. *See id.* ¶98. Prior to his arrest, Mr. Santana was participating in mental health treatment at McInnis Health Group in Boston. *See id.* Between 2018 and 2019, he was hospitalized at Solomon Carter

8

Fuller in Boston due to his mental health; he has additionally been hospitalized at Pembroke Hospital. *See id*. In 2007, he attempted suicide. *See id*. While detained at the Plymouth County Correctional Center, Mr. Santana has been prescribed both Prozac and Buspar. *See id*. In addition to his mental health problems, Mr. Santana has a chronic history of drug abuse. *See id.* ¶98. He has been diagnosed with cocaine dependance; he has also abused other drugs including heroin/fentanyl. *See id.* ¶102-104.

From 2019 to his arrest on October 22, 2022, Mr. Santana was homeless and residing in his vehicle. *See id*. ¶93. His only job has been at a pizza shop as a delivery driver; he has otherwise received Social Security Disability Benefits. *See id.* ¶106-107. His mother died of cancer in 2021, approximately a year before his conduct in this case occurred. *See id.* ¶89. He suffers from Type II diabetes, for which he is prescribed metformin twice per day' he also suffers from high blood pressure and sleep apnea. *See id.* ¶95. He also has degenerative discs in his back. *See id.* ¶97.

5.  **Sentencing Recommendation**

Mr. Santana was arrested on this case on October 22, 2022 and has been detained ever since. *See id.* ¶1. As of his sentencing date on December 14, 2023, he will have been in custody for 419 days, or 13 months and 23 days. This Court should sentence him to time served.

If the Court finds that Mr. Santana was a "minor participant," as requested here, Mr. Santana's total offense level would be 11. With a criminal history category of II, the guideline imprisonment range would be 8-14 months. Time served would be a sentence on the high-end of the guidelines.

If the Court finds that Mr. Santana was not a "minor participant," Mr. Santana's total offense level would be 13. With a criminal history category of II, the guideline imprisonment

9

rage would be 15 to 21 months. *See* PSR ¶113. Even where such a sentence would be just shy of a low-end guideline sentence, a sentence of time served would still be "sufficient, but not greater than necessary" to satisfy the purposes of sentencing identified by Congress. 18 USC § 3553(a).

The guideline range for a term of supervised release is 1 to 3 years. *See* PSR ¶116. Following his sentence of time served, this Court should order that Mr. Santana perform supervised release for a period of 2 years.

DATE: December 7, 2023

Respectfully Submitted,
MARIANO SANTANA
By his attorney:

/s/ David J. Grimaldi
David J. Grimaldi (BBO # 669343)
David J. Grimaldi, P.C.
929 Massachusetts Avenue, Suite 200
Cambridge, MA 02139
Tel: 617-661-1529
Fax: 857-362-7889
david@attorneygrimaldi.com

CERTIFICATE OF SERVICE

I, David J. Grimaldi, hereby certify that true copies of this memorandum were served on all registered participants via CM/ECF this 7th day of December 2023.

/s/ David J. Grimaldi
David J. Grimaldi